IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID F. KALETA, | : | Civil Action No. 4:12-CV-1987 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| VINNY CLAUSI, | : | (Magistrate Judge Carlson) |
| STEPHEN BRIDY, | : | |
| COUNTY OF | : | |
| NORTHUMBERLAND, | : | |
| | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

September 24, 2014

## I.  BACKGROUND

This case presents an emotionally charged dispute centered around the changing relationship between a resident of a county committed to improving decrepit county property and the county itself, by and through its elected officials. Because there are genuine issues of disputed fact, two of the claims in this case will be permitted to proceed and will be slated for trial.

### A. Procedural History

On September 17, 2012, plaintiff, David F. Kaleta filed a complaint and motion for a preliminary injunction in the Northumberland County Court of

1

Common Pleas based on Northumberland County's denial of Kaleta's access to lands, through two of it's commissioners, Vinny Clausi and Stephen Bridy.  On September 27, 2012, Northumberland County Court of Common Pleas Judge Charles H. Saylor, to whom this matter was previously assigned prior to its removal to federal court, entered an injunction order allowing Kaleta access to the lands.  ECF No. 1-4.  On October 3, 2012, defendants removed the complaint to the United States District Court for the Middle District of Pennsylvania and it was assigned to the Honorable John E. Jones III and jointly assigned to Chief Magistrate Judge Martin C. Carlson for report and recommendation on dispositive motions.

An amended complaint was filed on October 31, 2012.  ECF No. 8.  The three count amended complaint alleges defendants violated the Sunshine Act, 65 Pa. C.S.A. § 701, *et. seq.* and two distinct *First Amendment* violations pursuant to 42 U.S.C. § 1983, one alleging retaliation and the other, prior restraint allegations. The amended complaint also demands injunctive relief.  The case was reassigned from Judge Jones to the undersigned on January 17, 2013.

On November 4, 2013, defendants filed a motion for summary judgment on all counts.  ECF No. 45.  On June 18, 2014, Chief Magistrate Judge Carlson prepared a report and recommendation for the Court recommending that the claims

2

for injunctive relief and unlawful prior restraints be dismissed, and that the claims

of Sunshine Act violations and *First Amendment* retaliation be permitted to

proceed to trial.  ECF No. 56.

Defendants objected to the recommenced disposition in the report and

recommendation, and plaintiff has responded to those objections.  Plaintiff did not

object to the recommended dismissals of the prior restraint claim and demand for

injunctive relief.  Accordingly, the undersigned will conserve judicial resources

and adopt the recommendation of the Chief Magistrate Judge on these two issues

in full without further comment.

As will be discussed in detail below, the Court has throughly reviewed all of

the filings in this case.  The Chief Magistrate Judge's recommendations to the

Court governing all the other issues are wholly correct and will be adopted in full.

## B. Allegations in the Complaint and Undisputed Facts

As an initial matter, the factual background is lengthy and dense, and all

facts are adopted from the report and recommendation as set forth by Chief

Magistrate Judge Carlson. ECF No. 56, p. 3-24.

Plaintiff, David F. Kaleta (hereinafter "Kaleta") is a resident of Shamokin,

Northumberland County, Pennsylvania.  Defendants are Northumberland County

and two of the three current County Commissioners, Vinny Clausi (hereinafter

"Clausi") and Stephen Bridy (hereinafter "Bridy").  Clausi took office in 2008 and

Bridy took office in 2012.  Prior to Clausi and Bridy's elections, Kaleta apparently

had good relationships with Northumberland County officials.  In fact, the third

current commissioner, Richard Schoch, who also took office in 2012, was not sued

by Kaleta.  It appears from the undisputed facts that Schoch and Kaleta have a

positive working relationship.

There exists in Northumberland County a vast, 6,500 acre, undeveloped tract

of land. Kaleta has been actively involved in trying to enhance the land.  His work

improving the land began a decade before Clausi and Bridy were elected as

commissioners of Northumberland County.  Prior elected officals worked well

with Kaleta and were pleased with his efforts, which include planting more than

45,000 trees on the land and developing wildlife habitats.  Kaleta's vision for the

land appears to be one where animals and humans can coexist in harmony with one

another.  Kaleta has won a statewide award for his volunteer efforts.

The origins of the dispute between Kaleta and the two commissioners can be

traced to events that began years prior to the defendant commissioners' elections.

In 2007, a third party, Barry Yorwarth (hereinafter "Yorwarth"), conceived of an

idea to turn the land into a place for owners of motorized vehicles to be able to

enjoy off-road driving recreation, and began planning the project in 2008 with the

help of state agencies, specifically the Pennsylvania Game Commission and the Pennsylvania Department of Conservation and Natural Resources. Yorwarth is a member of the Northumberland County Anthracite Outdoor Adventure Authority (hereinafter "AOAA Authority"), an entity created to govern the 6,500 acre tract as land dubbed the Anthracite Outdoor Adventure Area (hereinafter "AOAA"). Yorwarth reached out to Kaleta to ask him to help with the motorized vehicle off-road driving project plans; Kaleta declined.

However, both contemporaneously to Yorwarth's work, and prior to it, Kaleta had also been working with state agencies, specifically the Pennsylvania Game Commission and the Pennsylvania Department of Environmental Protection, to further his vision for the land. In 2001, Kaleta created a conservation group called Habitat for Wildlife (hereinafter "HFW") to improve abandoned mines on the AOAA property to benefit wildlife and people. The individuals who were members of the County government at that time were pleased that Kaleta was willing to volunteer his time to organize reforestation efforts and prevent illegal dumping on the AOAA property. The Pennsylvania Game Commission and Department of Environmental Protection provided seedlings to Kaleta that the Northumberland County Commissioners permitted him to plant on the AOAA property.

5

In 2005, Kaleta incorporated HFW as a non-profit corporation in order to execute a lease with Northumberland County so that he could receive conservation grants from the Department of Conservation and Natural Resources to plant saplings on the land.

The relationship between Kaleta and Northumberland County began to sour in 2008.  That year Northumberland County planning director refused HFW's request to improve the property and further refused Kaleta's request to tour the land with a representative of the Pennsylvania Department of Environmental Protection. In 2010, Kaleta was notified by Northumberland County that the HFW's lease of the land would be allowed to expire at the end of that year and would neither be renewed nor extended.

Kaleta attempted to work with County officials to further his plan for the land, but these proposals were all rejected, as the motorized vehicle project was the preferred use of the land by the County after public meetings were held to discuss the project.

In 2011, after HFW's lease on the land had expired, Kaleta, without obtaining permission from Northumberland County, led the host and crew of the local television show, Pennsylvania Outdoor Life, onto the land for a nature show on small game hunting in Northumberland County.   In November  2011, Patrick

Mack, the Northumberland County Planning Director, sent correspondence to the host of the show informing him that Kaleta did not have permission to conduct activities on Northumberland County land.

In December 2011, Kaleta attended a Shamokin Area School Board meeting and opined that the land slated for inclusion in the AOAA was being held by Northumberland County illegally (it was, in fact, not being held illegally) and that it should be sold to pay the School District's deficit. Clausi attended the meeting and was offended by Kaleta's erroneous accusations.

In March 2012, a meeting was held between, among others, Kaleta, Schoch, Bridy and Mack.  The meeting was intended to determine HFW's role in developing the AOAA.  However, that intent was not realized, as the meeting became contentious and unproductive.

What transpired next is the subject of factual dispute and forms the basis of the claims that survive the defendants' summary judgment motion presently before the Court.  Commissioner Schoch asked Mack to grant Kaleta permission to use the land, specifically, to hunt. Because of the pre-existing tension between Northumberland County officials and Kaleta, Mack testified that he went to the other two commissioners, Bridy and Clausi, to ask them what to do.  Kaleta pointed to evidence that  requests of this nature are normally not brought to the

attention of the commissioners.  Further, the parties dispute the authority of Patrick

Mack and the Planning Department's authority as to the land.

It is, however, undisputed that on September 10, 2012, Mack sent Kaleta a

letter denying Kaleta's request to hunt on the land.  The letter stated "[t]wo of the

three members of the Board of Commissioners have considered, and ultimately

decided to deny your request."  In efforts to persuade the Court to deem this as not

being "official action" as a matter of law, the defendants describe this as a "poorly

worded letter" and argue that Mack made this decision alone.  Nevertheless, this

allegedly "poorly worded letter" exists.  As discussed below, it forms the basis of a

denial of summary judgment on two of Kaleta's four claims; Chief Magistrate

Judge Carlson reached the same conclusion.

One week after the issuance of this letter, Kaleta initiated this action by

filing a complaint and a request for a preliminary injunction in the Court of

Common Pleas of Northumberland County.   Judge Saylor held a hearing on the

injunction and entered a preliminary injunction in Kaleta's favor that required

Northumberland County to allow Kaleta at-will use of the AOAA property.  Judge

Saylor described the aforementioned letter as having a "disturbing tone." ECF No.

1-4 at 4.  At present, because of Judge Saylor's injunctive order, Kaleta is the only

individual who has continued, unfettered access to the property.

## B.  Report & Recommendation

As mentioned above, Chief Magistrate Judge Carlson recommended that plaintiff's claims for injunctive relief and *First Amendment* unlawful prior restraint against speech be dismissed.  There were no objections to the recommended dismissal of these two claims; accordingly, the report and recommendation will be adopted in full without further comment by the undersigned, and those claims will be dismissed.

The magistrate judge also recommended that plaintiff's claims for a violation of the Sunshine Act and his *First Amendment* relation claim be permitted to proceed to trial.  The Court will also adopt both of these recommendations, which will be discussed below as the defendants have objected to the denial of summary judgment on these two claims.

## II. STANDARD OF REVIEW

## A.  Summary Judgment

Summary judgment is appropriate when first, there are no material facts in dispute; and second, one party is entitled to judgment as a matter of law. *Int'l Union, United Mine Workers of Am. v. Racho Trucking Co.*, 897 F.2d 1248, 1252 (3d Cir. 1990) (citing Fed. R. Civ. Pro. 56(c)).

A district court may properly grant a motion for summary judgment "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those which might affect the outcome of the suit. *Id.*

Regardless of who bears the burden of persuasion at trial, the party moving for summary judgment has the burden to show an absence of genuine issues of material fact. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (internal citations omitted). To meet this burden when the moving party does not bear the burden of persuasion at trial, the moving party must show that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989) (quoting *Chippolini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d. Cir. 1987)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). More simply put, a party moving for summary judgment who does not bear the burden of persuasion at trial is not required to negate the nonmovant's claim, but only point out a lack of evidence sufficient to support the nonmovant's claim.

*Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir. 1991).

Once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that a issue of material fact remains. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party, however, cannot do so by merely offering general denials, vague allegations, or conclusory statements; rather the party must point to specific evidence in the record that creates a genuine issue as to a material fact. *Celotex*, 477 U.S. at 32; *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).

**B.  Plaintiff's Sunshine Act Claim**

Pennsylvania's Sunshine Act, 65 Pa. Cons. Stat. Ann. § 704, *et. seq.,* requires that "[o]fficial action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under section 707 (relating to exceptions to open meetings), 708 (relating to executive sessions) or 712 (relating to General Assembly meetings covered).  65 Pa. Cons. Stat. Ann. § 704.

Official action is defined as "(1) Recommendations made by an agency pursuant to statute, ordinance or executive order; (2) The establishment of policy

11

by an agency; (3) The decisions on agency business made by an agency; (4) The vote taken by any agency on any motion, proposal, resolution, rule, regulation, ordinance, report or order." 65 Pa. Cons. Stat. Ann. § 703.  A "meeting" is defined as "[a]ny prearranged gathering of an agency which is attended or participated in by a quorum of the members of an agency held for the purpose of deliberating agency business or taking official action." 65 Pa. Cons. Stat. Ann. § 703.

"Should the court determine that the meeting did not meet the requirements of this chapter, it may in its discretion find that any or all official action taken at the meeting shall be invalid." 65 Pa. Cons. Stat. Ann. § 713.  The Court may also, in its discretion,  award either party attorneys fees. "If the court determines that an agency willfully or with wanton disregard violated a provision of this chapter, in whole or in part, the court shall award the prevailing party reasonable attorney fees and costs of litigation or an appropriate portion of the fees and costs. If the court finds that the legal challenge was of a frivolous nature or was brought with no substantial justification, the court shall award the prevailing party reasonable attorney fees and costs of litigation or an appropriate portion of the fees and costs." 65 Pa. Cons. Stat. Ann. § 714.1.

The act was enacted to allow the public to observe the decision making process of public agencies.  *See Galena v. Leone*, 638 F.3d 186, 199 (3d Cir.

2011).

As discussed by the magistrate judge, the subject of the factual dispute that forms the basis of the claims that survive the defendants' summary judgment motion is what defendants describe as their "poorly worded letter." Mack testified that he went to Commissioners Bridy and Clausi to ask them what to do. Kaleta pointed to evidence that requests of this nature are normally not brought to the attention of the commissioners. Further, the parties dispute the authority of Patrick Mack and the Planning Department's authority as to the land. What remains undisputed is the fact that on September 10, 2012, Mack sent Kaleta a letter denying Kaleta's request to hunt on the land, which stated, in pertinent part: "[t]wo of the three members of the Board of Commissioners have considered, and ultimately decided to deny your request."

The defendants attempt to argue to this Court that the Chief Magistrate Judge erred and is establishing disconcerting, precedential law that would require relatively minor decisions to be openly discussed at public meetings. This argument is incorrect as a matter of fact and unpersuasive as a matter of law.

The Chief Magistrate Judge, and now this Court, are not, in fact, holding that every minor decision of county business must be debated and voted on at public meetings. The Court is instead holding that there are *disputed facts* that have been

13

presented by the parties that indicate, in this particular case only, that there is a *factual dispute* as to whether this particular decision denying access to Kaleta violated the Sunshine Act.  There is, contrary to defendants assertion, no holding that counties must hereinafter make similar determinations only at public meetings. Because there is a factual dispute as to whether this decision qualifies as one that should have been open to the public pursuant to Pennsylvania's Sunshine Act, this claim will proceed to trial for jury determination.

## C. Plaintiff's Constitutional Claim

In order for plaintiffs to prevail under 42 U.S.C. § 1983, they must establish two elements: first, that the conduct complained of was committed by a person acting under color of state law; and second, that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *See Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993). Defendants do not dispute that the conduct complained of was committed by persons acting under color of state law.  Defendants dispute the second element that establishes a claim under §1983, namely, they argue that plaintiff was not deprived of a *First Amendment* right.

The *First Amendment* to the United States Constitution protects citizens

right to speech.[1]  Accordingly, the government may not retaliate when our citizens exercise their Constitutionally protected rights.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000), *See ACLU v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."); *see also Pickering v. Board of Educ.*, 391 U.S. 563, 574, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech").  "Because government retaliation tends to chill an individual's exercise of his First Amendment rights, public officials may not, as a general rule, respond to an individual's protected activity with conduct or speech even though that conduct or speech would otherwise be a lawful exercise of public authority." *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 415-416 (4th Cir.

---

[1]It is important to note, however, for the lay reader of this opinion, that this right is not absolute.  "[T]he Supreme Court never has accepted the view that the *First Amendment* prohibits all government regulation of expression."  ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES THIRD EDITION (Aspen Publishers 2006), *and see Konigsberg v. State Bar of California*, 366 U.S. 36; 81 S. Ct. 997; 6 L. Ed. 2d 105 (1960).

2006), *citing Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674, 116 S. Ct. 2342, 135 L. Ed. 2d 843 (1996); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000); *see also Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) ("If the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited").  "Thus, by engaging in retaliatory acts, public officials place informal restraints on speech "allowing the government to 'produce a result which [it] could not command directly.'" *Suarez Corp. Indus.,* 202 F.3d at 685.  "Such  interference with constitutional rights is impermissible."" *Id. citing Perry v. Sindermann*, 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972) (alterations in original) (citation omitted).

Retaliation claims began in the public employment context to protect employees from being punished by their government employer for their speech. *See Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008), cert. denied, 128 S. Ct. 2445 (2008), *and see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,* 391 U.S. 563; 88 S. Ct. 1731; 20 L. Ed. 2d 811 (1968) (the seminal case on public employee *First Amendment* speech rights), *and see Garcetti v. Ceballos*, 547 U.S. 410; 126 S. Ct. 1951; 164 L. Ed. 2d 689 (2006).  *Jenkins* was the first case to expand *First Amendment* retaliation claims from the public

16

employment context to a viable cause of action for private citizens.

"A retaliation claim under 42 U.S.C. § 1983 must establish that the government responded to the plaintiff's constitutionally protected activity with conduct or speech that would chill or adversely affect his protected activity." *Balt. Sun Co.*, 437 F.3d at 416, *citing Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *ACLU v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993). "The determination of whether government conduct or speech has a chilling effect or an adverse impact is an objective one -- we determine whether a similarly situated person of "ordinary firmness" reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *Balt. Sun Co.*, 437 F.3d at 416, *citing Constantine*, 411 F.3d at 500; *Wicomico County*, 999 F.2d at 786; *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (tailoring adverse impact analysis to specific circumstances presented). "Because our analysis of the adverse impact is objective, it can be resolved as a matter of law." *Balt. Sun Co.*, 437 F.3d at 416.

"Illustrating the observation that "not every [government] restriction is sufficient to chill the exercise of First Amendment rights," we have recognized a distinction between an adverse impact that is actionable, on the one hand, and a de

17

minimis inconvenience, on the other." *Balt. Sun Co.*, 437 F.3d at 416.  "Rather, a §

1983 retaliation plaintiff must demonstrate that the defendant's actions had some

adverse impact on the exercise of the plaintiff's constitutional rights." *Suarez*

*Corp. Indus.*, 202 F.3d at 685, *See Wicomico County*, 999 F.2d at 785 ("In order to

state a retaliation claim, Appellees are required to show that WCDC's actions

adversely impacted these First Amendment rights.").  "[W]e must measure the

adverse impact against an objectively reasonable plaintiff." *Balt. Sun Co.*, 437

F.3d at 419. "To amount to retaliation, the conduct must be "sufficient to deter a

person of ordinary firmness from exercising his First Amendment rights."" *Mun.*

*Revenue Servs., Inc. v. McBlain*, 347 Fed. Appx. 817, 824 (3d Cir. 2009)

(unpublished) *citing McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006).

"In a proximate vein, the Supreme Court has condoned limiting retaliation

liability when the challenged government action, whether conduct or speech, is so

pervasive, mundane, and universal in government operations that allowing a

plaintiff to proceed on his retaliation claim would "plant the seed of a

constitutional case" in "virtually every" interchange." *Balt. Sun Co.*, 437 F.3d at

416, *citing Connick v. Myers*, 461 U.S. 138, 148-49, 103 S. Ct. 1684, 75 L. Ed. 2d

708 (1983); *see also id.* at 143 (holding that, in the government employment

context, public employers can reprimand or punish employees for their speech

18

when that speech does not touch on matters of public concern); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 448-49 (4th Cir. 2004); *cf. Umbehr*, 518 U.S. at 675 (noting that retaliation "may be justified [i.e., unactionable] when legitimate countervailing government interests are sufficiently strong"). "Thus, the *Connick* Court recognized that the retaliation cause of action must be administered to balance governmental and private interests so as not to impose liability in everyday, run-of-the-mill encounters." *Balt. Sun Co.*, 437 F.3d at 416. "[A] public official's malicious intent, taken alone, cannot amount to a retaliatory response." *Id.* at 420. "The plaintiff in a retaliation case must challenge adverse *conduct or speech.*" *Id. citing Constantine*, 411 F.3d at 500 (repeating that retaliation claims challenge government "conduct").

"Illustrating the second *DiMeglio* (*DiMeglio v. Haines,* 45 F.3d 790 (4th Cir. 1995) observation that not "every restriction [is] actionable, even if retaliatory," we have recognized that some government actions, due to their nature, are not actionable even if they satisfy all the generally articulated elements of a retaliation claim." *Balt. Sun Co.*, 437 at 416-417. "When the challenged government action is government speech, there is no retaliation liability -- even if the plaintiff can demonstrate a substantial adverse impact -- unless the government speech concerns "private information about an individual" or unless it was "threatening, coercive, or

19

intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow."" *Id.* at 417, *citing Suarez*, 202 F.3d at 689. "Other courts, likewise, have held that there is no retaliation when the government's alleged retaliatory action was government speech." *Balt. Sun Co.*, 437 F.3d at 417 *citing*, *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998); *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997); *accord Kirby*, 388 F.3d at 450 n. 8. "This limitation on the retaliation cause of action based on government speech is necessary to balance the government's speech interests with the plaintiff's speech interests." *Balt. Sun. Co.*, 437 F.3d at 417, *citing Suarez*, 202 F.3d at 688-89.

"Determining whether a plaintiff's *First Amendment* rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp. Indus.*, 202 F.3d at 686, *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) ("The definition of adverse action is not static across contexts.").

As Judge Hamilton wrote for the *Suarez* court:

Just as the nature of the retaliatory acts impacts whether a public employee's *First Amendment* rights were adversely affected, so too the nature of the retaliatory acts impacts whether those acts are actionable when a private citizen is the speaker and a public official is the retaliator.

For example, a public official who restricts the award of or terminates public benefits based on the citizen's exercise of his *First Amendment* rights adversely affects that citizen's *First Amendment* rights. *See, e.g., Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 686, 135 L. Ed. 2d 843, 116 S. Ct. 2342 (1996) (holding that the termination of a garbage contract constituted retaliation for an independent contractor's exercise of freedom of speech); *Sherbert v. Verner*, 374 U.S. 398, 409-10, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963) (holding that retaliation existed where the government denied unemployment benefits to a person whose religion precluded her from accepting a job that required her to work on Saturdays). The same officials, however, are obviously permitted to require the government contractor to submit documentation that no public funds were spent on espousing political views, or to require a person seeking unemployment benefits to fill out an additional form explaining why she cannot work on Saturdays.

*Suarez Corp. Indus.*, 202 F.3d at 686.

"In general, constitutional retaliation claims are analyzed under a three-part test." *Mun. Revenue Servs., Inc. v. McBlain*, 347 Fed. Appx. 817, 823 (3d Cir. Pa. 2009) (unpublished) *citing Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004). " Plaintiff must prove (1) that [it] engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Id.*

In the case at bar, it is the letter directed to Kaleta and the circumstances surrounding both its authorship and its substance that form the basis of allegedly retaliatory action that inform the determination that this is a factual issue that appropriate for a jury to decide at trial and not for a judge to determine on

dispositive motion.  The testimony of Mack, together with the testimony

surrounding the tortured history between Kaleta and Clausi and Bridy show that

Kaleta may be able to meet his burden of proof at trial that the defendants may

have denied him access to the lands in order to retaliate against him.

Defendants argue that denial of Kaleta's access to the land was merely part

of a larger initiative to deny everyone access to the land so that the County could

develop the AOAA into an off-road vehicle recreational area.  This is a plausible

defense that defendants may present to the jury; it is not one that the Court should

merely adopt as truth in order to enter judgment in defendants favor.

In addition, defendants argue that Kaleta's amended complaint did not

specifically allege that Mack's discussion with Clausi and Bridy formed the basis

of retaliatory action by the defendants.  However, the Court finds that paragraph 29

of the amended complaint, ECF No. 8 at 4-8, which was incorporated into the First

Amendment retaliation claim at, what appears to be a typographical error, also

numbered paragraph 29, ECF No. 8 at 8, is sufficient to put the defendants on

notice that their actions surrounding the letter formed part of the basis for the

complaint against them.  The amended complaint is sufficient to satisfy "the

simplified notice pleading standard of the Federal Rules."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 585, 127 S. Ct. 1955, 1982, 167 L. Ed. 2d 929 (2007).

## III.  CONCLUSION

In light of the foregoing, the report and recommendation of Chief Magistrate Judge Carlson will be adopted in its entirety.  Defendants' motion for summary judgment on plaintiff's claims for injunctive relief and *First Amendment* unlawful prior restraint against speech will be granted, the claims dismissed, and final judgment entered in favor of defendants and against plaintiff on these claims. Defendants' motion for summary judgment on plaintiff's claims for a violation of the Sunshine Act and his *First Amendment* retaliation claim will be denied.  These remaining claims will proceed to trial.

The Court will issue a separate Order that will schedule a telephone conference call which will establish a pre-trial agenda and fix a date certain for trial.

An appropriate Order in accordance with this Memorandum will follow.

BY THE COURT:

 s/ Matthew W. Brann
Matthew W. Brann
United States District Judge